Our 2019 1, 2, 3, 4. Mr. Trask. Good morning, your honors. May it please the court. Andrew Trask for Appellant Google. There's only one claim step alleged here to be missing from the prior art, and that is the step of returning the keypad to the default state. Philips agrees that all of the other claim steps, including the step of providing the keypad in the default state in the first instance, is disclosed by the prior art Cicada II reference. The prior art, therefore, left the person of ordinary skill with a binary choice. After performing all of the other steps, the keypad either returns to the default state or it doesn't. What do you mean the prior art left the person with a binary choice? At least as described in your petition, the prior art said, replace the key that you initially pressed with the item you selected on the little menu that I'm going to assume that you just did not argue claim one in the petition to the board, so that all Cicada actually taught was the replacement of the selected backup key item onto the original key. So the Cicada II reference does teach character substitution in figure 8 bodyman. So as your honor described, taking the secondary character that was just selected and replacing the underlying key. Of course, all of the other keys in the Cicada II keypad remain unchanged. Right, but there's nothing behind them that pops up when you press any of the letter characters. Well, there's a number of keys on the Cicada II keyboard that can undergo, there can be the pop-up secondary character menu. But more than the 10 in the right-hand columns? That's right. Just the 10. Those are the only ones that change, right? That's correct. That's correct, yeah. So there are a number of keys that can undergo substitution within Cicada II. When a secondary character is selected in the figure 8 embodiment, one of the keys undergoes character substitution, the others do not. And as we explained throughout the preceding... The ones that you haven't tapped. That's right. You tap only one of the 10, that one undergoes substitution, then the other nine don't because you haven't tapped them. That's correct. Now, of course, as your honor mentioned, there's the claims of Cicada II, which are also prior art to the patent issue here. The claims, and the testimony supports this, teach... My problem with that is that I don't think it is really reasonable to say that you made that point in your petition. Well, the petition, so that point was not raised in the petition, your honor. It was raised in the... Phillips asked the question to Google's declarant at his deposition. This was before Phillips ever filed his patent owner response. The point does get developed later in the proceeding. Yeah, and Phillips has an opportunity to address that embodiment of Cicada II directly. Phillips also never alleged at any point during the proceeding that Google's reliance on the claims of Cicada II was belated or untimely. Phillips could have objected to the reliance on that embodiment. Phillips did not. Phillips was asked by the board at the oral hearing about the claims of Cicada II. Not only did Phillips not note that the reliance on that embodiment was somehow belated, but Phillips actually agreed that the claims do not undergo character substitution. So there are two options that Cicada II discloses, either returning to the default state or not doing so. And it's undisputed here that the keypad contemplated by the 913 patent... When you say returning to the default state or not doing so, don't you mean that Cicada II discloses staying with the substitution or not necessarily doing so? That's right, Judge Preston. But the default is not expressly disclosed in Cicada, as I understand, even in the independent claims. It simply leaves off any reference. And your inference from that is, well, there are only two choices, and therefore it must by implication have disclosed the second choice. That's your inference. It would have been the inference of the person of ordinary skill, as shown by the testimony of record, which of course is evidence in itself. And that was Dr. Coburn's... Dr. Coburn, that's right. That was his understanding, right? That's right. He testified to that effect. So there's evidence of record saying that the person of ordinary skill would have understood Cicada II to disclose two options in following the selection of a secondary character. Now, if that weren't enough to demonstrate that this final limitation is peripheral and trivial to the claimed invention, we also have here kind of almost a unique circumstance where we've got a reissued patent, which itself isn't particularly common. And then we've got admissions by the patent owner to the patent office during reissue acknowledging that the returning to the default state does not confer patentability on the claims. It's not central to the claim. So this is, of all acknowledged error in the original claims, would contain the identical returning the keypad to the default state limitation. In any event, isn't returning to the default state in Buxton? That's right as well, Your Honor. Yes, it's expressly disclosed in Buxton as well. This is a combination of rejection on obviousness. That's right. Both grounds are obviousness. It's either a single... Not a rejection, assertion. That's right. There's two grounds. One is Cicada 2 plus Buxton, where Buxton supplies expressly the missing limitation, purportedly missing limitation from Cicada 2. So we've got admissions by the patent owner that this exact claim limitation does not, quote, improve on the state of the art, unquote. That's Appendix 513. That's Phillips' own words to the patent office. And that's referring to the original claims that were submitted for reissue, claims which Phillips itself admitted contained an error. The error, according to Phillips, was that the claim claimed more than Phillips had the right to claim. So what did Phillips do? It narrowed that claim, and it narrowed it by adding new limitations to Independent Claim 1. Those limitations are the predetermined time period limitations. They have nothing to do with returning to the default state. So the board here made a legal error in its analysis of the first ground of unpatentability. And that legal error is failing under this court's precedent to understand the before considering whether common sense could be applied to that limitation. This court's body of precedent. Character being the peripheral nature of the limitation, is that that's your Arendi argument? That's right. So it's peripheral versus central. There's some other words that are used in these cases, but that's essentially the nub of it. Let me ask you this question before you get into that argument. But assuming that we do not agree with your characterization of Arendi and the associated cases, Perfect Web and Herewhere, and instead think that those cases were really saying you can't use this untethered common sense to supply a limitation, especially in cases in which the limitation is central. Assuming we don't agree with you on that, and assuming have a path to winning the case. And if so, what is it? I do, Judge Bryce. And the answer is that there isn't simply a bare common sense here that's capable of being applied to this missing limitation. There is in fact underlying documentary evidence, as well as underlying expert testimony, which supports the application of common sense. So this isn't a case that maybe was contemplated by some of these cases where you have common sense and nothing else. Now the Perfect Web case is actually that case where the court said this is such a simple limitation, it's just returning to a prior step which was known in the prior art. Same here, a step which returns to a prior step which was known in the art. And because of the manifest simplicity of that limitation, it's appropriate to apply a common sense with nothing more. And what this court said in Perfect Web is that expert testimony is not required in that instance. But even if this court disagreed with that reading of Perfect Web, which I think is quite plain from Perfect Web itself, this is... Well, the court, I guess, in Arundi said that that was really an outlier case. I think that's a fair reading. The court in Arundi said that Perfect Web is the exception, not the rule. And I submit to Your Honor that this case before you today is that exception. This is an unusual case where we've got a reissue patent and we've got admissions by the patent owner directly to the patent office bearing on the precise claim limitation at issue here. Okay, now what besides, in Dr. Coburn's declaration and deposition, what is there to support his argument that this is common sense? The board complained that there was no support for his expression of personal opinion in that regard. Right, so I don't think the board actually considered his testimony. This is at appendix page 2785, which is that the person of ordinary skill would understand that Cicada 2 contemplated no character substitution at all. And he was referring there to the claims of Cicada 2. The board never acknowledged the claims of Cicada 2, certainly never found that Google had raised them belatedly, but never even considered that aspect of the disclosure at all. And there's You mean the independent claim-dependent claim relationship. Of course, the board discussed that in the oral argument, so they obviously were aware of it. That's right, and they didn't mention it at all in the final written decision. Right, but that in and of itself isn't enough to sink the board's judgment, do you think? I mean, they're often issues that the board or a court may decide are not worthy of discussion, as long as it's clear that they were brought to the board's attention and the board was aware of it. That's true. I mean, Your Honor's question was what is the evidence that the person of ordinary skill would have understood that common sense could be applied to this claim. Okay, but besides the independent-dependent claim, is there anything else supporting Dr. Coburn's opinion in that regard? Sure, so within Cicada 2 itself, there's also the reference in Cicada 2 to the fact that the claims may be, that the characters may be appendix 309. And there's other aspects of the Cicada 2 reference, the abstract, this is at appendix 306, the effect of the invention section at appendix 312, all of which disclose entry of a secondary character, but no subsequent substitution of the character. And according to the expert testimony of record, these are disclosures that a person of ordinary skill would have understood to be teaching this choice, either you substitute or you don't. Can I just ask a question? This term may be, seems to me, pretty plainly can have a couple of different meanings, one of which can help you, one of which perhaps doesn't. Is there any issue of translation here? That is, does the, Cicada 2 is an English translation of the Japanese. Has anybody raised any question about whether in Japanese the term that got translated into the English maybe has, you know, is a, here are some options, or this allows you to do this, or a number of other things. I understand your question, Judge Toronto. To my knowledge, no one has raised that issue. I'm well into my bottle time. If the court would allow it, I'd like to reserve the rest of that time. We will save it for you. Thank you. Mr. Oliver, I think I might have seen you yesterday. You did, Your Honor. Good morning. May it please the court. Google asked this court to set aside the board's proper finding of fact and in its place mandate acceptance of common sense. This fails for two primary reasons. First, the board did consider the common sense theory offered by Google, but simply found it to be deficient. The board found that, and I quote, Dr. Cockburn's testimony is insufficient to overcome Cicada 2's explicit teaching. Essentially, what Google argued below is despite Cicada 2 saying this is the efficient way to do things, it would be obvious to do the exact opposite and base that nothing more on the unsupported opinion testimony of Dr. Cockburn. However, the board found that the declaration testimony in this regard, again quoting, was not grounded in underlying facts and data. The second error is that Google tries to argue here that the Arendi case mandates acceptance of common sense. So put aside the whole discussion about Arendi. Put aside even claim one of Cicada 2. When you press on a key and there's a little menu of 10 alternatives that come up and you select one of them, there are basically only two things that can happen when you're done with that. The original item on the key returns to the key or the one you tapped goes on the key. I mean, I can imagine some alternatives where you are given an option, which one do you want? But it's a tiny number or in KSR terms, a finite number, an extremely finite number of pretty self-evident options. Why is that not the right basis for resolving this case? Well, that came up during the oral hearing below as well, specifically in the appendix at APX 3384 and 3385 of what follows. And basically the discussion there was this. We have to understand the time at which all of these took place, Cicada 2, the invention, and Hoxton and those others. This was at a time where we were sort of springboarding from standard physical keyboards into how are we going to fit all of this into these small mobile devices, particularly mobile devices that had touchpads. And that was difficult to do. There were several things that had to be solved. Hoxton went to solve one problem. On a standard keyboard, you have to press two keys at once to get functions, shift and a letter, control and a letter, and you can't do that on a touchpad. Hoxton dealt with that. Now each other sort of area jumped into a different direction. Some solutions offered at that time, and again, this is in the infancy of these keyboards, jumped into what were called predictive keyboards, and that's discussed in the appendix at 41 column 2. These predictive keyboards, when you touch the key, it would change the entire keyboard based on what it predicted you might want to touch next. There were also multi-tap keyboards where you can only fit a number of keys, and there are multiple characters assigned to each key. So you would tap the number of times, depending on whether you wanted the first key, the second character, the third character. And then there were adaptive keyboards, which is the type of Sakata 2. And so what Sakata 2 said is for the keys 21, which were most akin to letters, we're going to keep them the way they are. They're never going to change. But for keys 22, where these specialized characters, the types of characters don't really appear on a keyboard. The types you would get from going into a menu using a mouse. How are we going to get to those keys? And what Sakata 2 said, if we're jumping from a manual keyboard and mouse into that, we need to find an efficient way to get to these specialized characters. And what they said is you're going to have to adapt the way the user works. So to say there's one way to do these things is simply not really understanding what was going on at the time. But why isn't the right one that is well past all of the range of possible keyboards and choices and adaptive keyboards and predictive keyboards and double key selection mechanisms to what does Sakata say? Sakata says here in the prior art, here's one way to get more options before the user have a number of keys in which by holding it a little bit long, you get some more options. Now at that point, there are really only two things that can happen once you've made your selection. Well, there are a number of ways to combine the different ideas. What Sakata 2 really said is that dealing with these characters other than the 50 sound characters, the letter type things, that there was this heavy burden in these specialized keys. And that's stated in the appendix at 308, paragraph six through eight. And what Sakata specifically said to do for these types of special character keys, it is quicker and more efficient. They actually said carried out more quickly to perform this adaptive function. So what the board acknowledges that the primary reference says, do this. And the board is basically saying if you're going to tell us to do the exact opposite of what the reference explicitly says to do, you can't provide us only with unsupported opinion testimony. You must provide us some sort of factual underpinning or other evidence or support for doing the exact opposite of what the primary reference teaches. And the board said there's simply not sufficient evidence to support that. So one of the reasons, and then I'll stop on this, but it seems to me that one of the distinctive things about the obviousness to try way of establishing obviousness is that you don't really need a particularly good reason to try this tiny number of predictably successful things. If it's a small enough number and it's perfectly clear what's going to happen with each of them, it's not really an answer, I think, under the obviousness to try paragraph of KSR to say, well, what we had was kind of good enough or it might even be the other options, the other two options or three options or here perhaps one option might not serve an additional purpose. Somebody would try them. And here it's beyond that. Well, let me just stop on that. Well, first and foremost, I'd note that even Dr. Cockburn, Google's expert, acknowledged in the appendix of 2680 and 2681 that there are a myriad of ways to pick and choose among different designs and to combine different designs. But I keep wondering if that's going much too far back in the process of prior art. If you start with Sadaka, so you now have here's a technique for getting more choices, holding the keys for slightly longer to give you other options. At that point, the range of possibilities shrinks to something extremely small. We have to think about what Google argued for the basis for doing so. Their argument was that it would be obvious to do so because you'd want to go back to a standard familiar layout. The problem with that was that these are not standard familiar keys. It's the millimeter character. It's not something that appears on a keyboard. There was no standard familiar layout for these specialized characters. Because these were specialized characters and not the sound characters equivalent to letters, for that, they were teaching a very specialized thing. That for these unusual characters, how are we going to access them in a keyboard? They weren't thinking of what's the option given these click menus. They were trying to figure out how to get a user selection in, for instance, using a mouse and going up to a menu to get an unusual key, how to fit that into a keyboard. And they were trying to figure out how's the most efficient way to do that. They did that by saying, if you're using a millimeter key, it makes sense to adapt to the millimeter key. Now what you're saying is, well, why wouldn't you do it the other way? Well, you don't do it the other way simply because the theory given for doing it the other way is that you'd want the familiar layout. That, from Google's burden, requires an underlying factual consideration. If your theory is you would do it because you want to go back to the familiar layout, you have to prove that there was a familiar layout to go back to. And here there's simply an absence of that. We're not talking about a QWERTY keyboard. We're not talking about letters. We're talking about keys for which there was no familiar layout. And absent, if your reason for going back is that, you need to prove that predicate. And it was Google's burden to prove that predicate and simply failed to do so. Well, I understood Google's argument on the familiar layout point to be that you want to have a keyboard which stays looking the same throughout the user's use of that keyboard for however many months or years the user uses that keyboard except when you punch one of these keys and momentarily have a different group of selections. But the familiarity factor, as I understand the argument, is that the default keyboard and the keyboard including features that will return to the default will be the same. With respect to that, your honor, that is something that was asserted, this golden rule of consistency. But what the board found is that that was not what the golden rule of consistency found. They considered the testimony from two experts. And with respect to consistency, this idea of consistency was consistent operations, not consistent keyboard layouts. A predictive keyboard always is changing, but it's consistently doing that. The idea of consistency in terms of what a person was coming out understood was not a layout issue, but an operation issue. And what the board found in that regard, that Dr. Cockburn, this is the appendix 21, failed to support the idea of Cicada II violating that golden rule and credited Dr. Porter on this, also in the appendix 21 and 22. What the board acknowledges is that idea of consistency covers a wide range of concepts, not just a layout of a keyboard. Layouts can change as long as they change consistently and they respond to the user consistently. So what was really at issue here is Dr. Cockburn's testimony being unsubstantiated. His statement concerning what was consistent was incorrect. His understanding of the characters in Cicada II was incorrect, even though some of them were translated therein. His understanding of what a standard keyboard looks like in Japanese was incorrect. So it was the lack of supporting evidence and his incorrect assumptions about what was needed in consistency, what was needed as far as standard layouts. And the board simply said, if you're going to be providing us only opinion testimony, you must have more than that. So the consistency is not the keyboard layout, but the operation and user experience. In your brief, I think it's fair to say in passing, you make a suggestion that Google has waived the argument that it now makes about the distinction between Claims 1 and 4 and 6 and 9. Do you press that argument? You didn't use the term waiver. I think you used the term belated. Are you making a waiver argument? Yes, Your Honor. And their answer to that, I guess, is twofold. One is that you raised the teaching away argument in your patent owner response, and their argument about the Claim 1, Claim 4, and Claim 6, and Claim 9 disclosures was in response to that, which is legitimate under the board's rules. And also, that you didn't make any objection to that evidence on the ground that it was belated before the board. Can you respond to those points? With respect to what took place before the board, that was not made as an objection, because what we understood, and what the board understood, is that the actual argument being presented was an argument for modifying Staccato 2. Well, but the whole point made, I think, at some length in the reply is of the petitioner, and discussed by Dr. Coburn, was that Claim 1 discloses, by implication at least, the alternative to substitution, that alternative being default. With respect to that, the argument that was made below, and let me just find here, specifically in the appendix at 88 and 89, and also in 83 and 84, was specifically modifying Keys 22, the operation of Keys 22. And it was caused, what they referred to it as, was an insubstantial change. They were changing Staccato 2. And then they went on, in the appendix at 90 and 92, to explain why they were changing Staccato 2. What the board found below, and the reason we never objected to it, is because both the board and Phillips did not think that they were changing their theory on Staccato 2, as to whether or not there would be a change. The board specifically stated, in the appendix at 17, the parties agree that Staccato 2 does not meet this limitation, and dispute whether a person with a learning skill in the art would have modified Staccato 2. We didn't object to their raising Claim 1, because we didn't think it was changing their underlying premise that they're proposing a modification of Staccato 2. On appeal, it seems to be that they're no longer proposing a modification of Staccato 2. They're somehow proposing that this May language is an explicit teaching. That argument is certainly waived, because the petition expressly relied upon modifying Staccato 2. The board's decision acknowledged that it relied upon modifying Staccato 2, and it simply found that its basis for modifying Staccato 2 was unsupported opinion testimony. Google simply didn't make or didn't provide the evidence necessary to meet the preponderance of evidence standard with respect to modifying special key characters 22 in Staccato 2. Now, I know their briefing here says, well, it would be obvious to use this on a QWERTY keyboard. Again, not an argument made below. If they're talking about QWERTY keyboard, they'd be talking about keys 21 of Staccato 2, which are closest to letters. There was a very specific argument here. Would you do something differently for keys 22 than what Staccato 2 explicitly tells you to do so? Their basis for changing that explicit teaching was unsupported opinion testimony that fell apart. And with my remaining time, I'll point out a few places where the board explained why it fell apart. How much remaining time do you think you have? 20 seconds, I believe, Your Honor. I'll give you 20 seconds. That's a red light. Oh, I'm sorry, Your Honor. I'm over by 20. I'll give you 20 seconds. The board stated that there were defects in Dr. Cochran's testimony, that it was insufficient to establish a preponderance of evidence, that his testimony was unsubstantiated, was not grounded in underlying facts or data, and rested on a fundamental misunderstanding of the characters about which he testified. That was the reason for the decision below, and that reasoning was correct. Thank you, Mr. Oliver. Mr. Trask has two minutes plus to rebut. So briefly on rebuttal, Your Honors. First of all, Judge Toronto, you asked a question pertaining to aren't there just two options here, returning to the default state or not? And I heard my friend on the other side mention a number of design choices like predictive entry, multi-tap. I think your insight on that is correct, Your Honor, which is that Philips is just turning back the clock too far. I mean, everyone agrees that predictive keyboards and multi-tap keyboards are things that existed in the prior art, but they're not things that were ever contemplated by the person of ordinary skill in reviewing the Sakata II reference. Those are other technologies that are further afield from what's actually disclosed in the reference. Based on Sakata II itself, the only testimony in this case is that the person of ordinary skill would have had two options, returning to the default keypad or not. Same with respect to their reference to the myriad ways in Dr. Coburn's testimony. He was talking about the variety of design choices one had in the prior art for keyboards. He wasn't talking specifically about the options available to the person of ordinary skill based upon the Sakata II disclosure. Second of all, Judge Bryson, your point with respect to KSR. It's right that the obvious-to-try discussion in KSR really doesn't contemplate kind of a concrete reason. It's enough if there's a limited number of choices and they're available to the person of ordinary skill. Here, of course, it's undisputed, however, that there was a reason for the person of ordinary skill to either substitute the character or not. And that reason is that as Phillips' own expert acknowledged, and this is on appendix page 3284, characters are used with different frequencies, quote, depending on the context. And Phillips, in its own brief on page 15, acknowledges that the declarants from both parties acknowledged that how often particular characters would be used was context-dependent, varying based on the user and the situation. In other words, sometimes it's more efficient to substitute the character. Sometimes it's more efficient to return to the default state. So although KSR doesn't require necessarily a firm reason, if there's a finite number of identified predictable solutions, we have that reason here in the record. What was that citation? Some people would prefer one. Some people would prefer the other. Right, so there was Phillips' expert, Dr. Porter, on 3284 of the appendix, said that the characters used with different frequencies, quote, depend on the context. And then Phillips, in its own brief, acknowledged in describing the case history here on page 15, that declarants from both parties acknowledged that how often- So I guess the way that I might understand that is a chemist might prefer to have the millimeter replaced by a milligram, but a carpenter might really prefer to keep the millimeter. That's exactly right, and Your Honor may be referring to the testimony of Phillips' own expert, who acknowledged in his deposition at page 3284 that a chemist would be more likely to use a milligram than a millimeter. And in that particular context, it wouldn't make sense to substitute the millimeter character with the milligram character for that purpose. I see him over my time. You don't need 20 more seconds. I'll just ask that the court, for the reasons stated in our briefs, and here today at oral argument, that the court reverse the board's decision. Thank you, Mr. Kraft. The case will be taken on the submission.